APPEL, Justice.
This appeal involves an important intersection involving mental illness and the criminal justice system. In this case, a criminal defendant's lawyer moved midtrial for a competency examination of his client who, due to the stresses of trial was "incapable of aiding [him] in her defense." The record reveals that the client, among other things, testified she suffered from paranoid schizophrenia but had stopped taking prescribed medications due to lack of funds, stated that she wanted to stab her lawyer in the neck and wanted to kill him, declared that she did not know why her lawyer was sitting next to her, told the court that she had called the FBI and was told she did nothing wrong, and further declared that she would not write notes to her lawyer during trial for fear the lawyer would pass the notes to the prosecution. The district court denied the motion and the case proceeded to verdict. On appeal, the defendant claims the district court erred in not ordering a competency examination and in excluding evidence. For the reasons expressed below, we reverse the judgment of the district court and remand the case for further proceedings.
I. Factual Background.
Wonetah Einfeldt and her two daughters were charged with willful injury causing bodily injury over a physical altercation between the three women and a fourth woman named Mulika Vinson on July 14, 2015. The case went to trial and the defendants were tried jointly.
Prior to trial, the State sought to exclude all character evidence about the victim, Vinson. This included evidence related to Vinson's prior threatening behavior and her convictions for two assaults and an escape in Nebraska in 2001. She was fifteen or sixteen years old at the time of the first assault and nineteen years old at the time of the second assault. At the time of trial, Vinson was thirty-one years old. Further, the State sought to exclude evidence of a shooting that occurred at Einfeldt's apartment complex the evening of the altercation between Einfeldt, Einfeldt's daughters, and Vinson. The State asserted that the police found no evidence of Vinson's *776 involvement in the shooting or that the shooting was directed at Einfeldt. Finally, the State sought to specifically exclude testimony by Lacey Chicoine about Vinson's reputation for violence.
Einfeldt resisted this part of the motion in limine. She argued that this character evidence was admissible due to her self-defense justification defense rendering Vinson's character relevant and probative. With respect to the shots fired the evening of the altercation, Einfeldt argued that the evidence was relevant because it supported Einfeldt's belief that Vinson was a danger to her and others.
At a pretrial hearing, the district court judge reserved ruling on the admissibility of Vinson's prior felonies. The court sustained the part of the State's motion in limine with respect to the shots fired at Einfeldt's apartment complex, but emphasized that this was a preliminary ruling and stated that Einfeldt could make an offer of proof at trial at which point the court might reconsider its ruling. With respect to Chicoine's testimony about Vinson's reputation, the court stressed that proper foundation would have to be laid to show that Chicoine was aware of Vinson's reputation.
After jury selection, but before the presentation of evidence, Einfeldt again raised the issue of Vinson's prior felony convictions. The district court found that the probative value of the evidence was outweighed by its danger of unfair prejudice, given how long ago the convictions happened and Vinson's age at the time.
Later during trial, an attorney for one of Einfeldt's daughters made an offer of proof concerning Chicoine's testimony about Vinson outside the presence of the jury. Chicoine related that at one point she and Vinson were dating the same man, and Vinson threatened to "kick [Chicoine's] ass" or "beat [her] up" if Chicoine didn't stay away from the man. These threats were verbally made to Chicoine over the course of six months. Vinson never assaulted Chicoine, however. Chicoine was not aware of Vinson ever assaulting anyone.
The district court found that Chicoine's testimony about threats was only marginally relevant to the issue of Vinson's character trait of being prone to physical aggression. The court noted that Vinson only made threats and never assaulted Chicoine. The court thus excluded the evidence as more prejudicial than probative.
When Einfeldt made an offer of proof about the shots-fired incident at her apartment complex, the court ruled that evidence about the incident was inadmissible. The court found that the victim's character could not be proven by a specific instance of conduct in this case or, alternatively, that there was not clear proof that Vinson was involved in the shooting, and so the probative value of the evidence was outweighed by the danger of unfair prejudice.
At the beginning of the third day of trial, Einfeldt's attorney advised the court that his client did not remember the events of the previous day. He called his client to the stand to further make a record for the purpose of seeking a competency evaluation under Iowa Code chapter 812 (2015). When asked if she remembered the events of yesterday, Einfeldt responded, "No, I guess not. I don't know." She testified that she did not remember calling the prosecutor a liar or that she slammed her hand down and was animated with her lawyer. Further, Einfeldt volunteered, "I just want to kill you [her lawyer]."
Einfeldt testified that she thought her lawyer was taking her written notes and giving them to the State and to other *777 parties.[1] She admitted that she told her lawyer that she wanted to stab him "with my pen in your neck." When asked if she could pay attention to the trial, be helpful to her lawyer, and assist the court when asked to do things, she responded, "Yeah. Yeah, I don't know, I don't hear any noises. It's not buzzing. I just really-I'm in control." Einfeldt volunteered that someone was "poisoning the water." In light of this testimony, her lawyer told the court that Einfeldt has suffered from mental health issues in the past and that "the stress of the trial has caused her to be incapable of aiding [him] in her defense."
When the district court asked her if she could assist her counsel, Einfeldt said, "I just, I believe that I don't-I kind of don't, really. I do, but I don't know who he is sometimes. Right now I don't know why he's sitting by me. I don't understand this." Einfeldt recognized, however, that the person sitting next to her was her attorney. When the district court asked whether she understood the charges, she stated, "I don't, honestly. I called the F.B.I., and they said they don't think I did anything wrong."
When asked by the district court if she understood that she was being tried for the assault of Vinson, she responded, "I guess I don't know what assault means, because I think that I have a right to defend myself." When asked if she thought she had a defense to the charge, Einfeldt responded, "Yeah. I don't know."
Einfeldt told the district court that she had been diagnosed with paranoid schizophrenia, bipolar disorder, posttraumatic stress disorder, and attention deficit disorder. She stated she had prescriptions for these disorders but had not been taking her medication for a couple of months because she did not have the money.
The district court denied the request to suspend the proceedings and order a chapter 812 examination. The district court concluded that based on its observations, Einfeldt was capable of assisting counsel in providing a defense and understood the nature of the charges against her.
The district court revisited the question prior to sentencing. At this juncture, the district court had the opportunity to review Einfeldt's medical records as well as a presentence investigation (PSI) report prepared by the department of correctional services.
The medical records from 2013 showed a provisional diagnosis at Broadlawns Medical Center (Broadlawns) of paranoid schizophrenia. The records stated that Einfeldt reported leaving Minnesota because people wanted to kill her. She further stated that the television talked to her. Her thought processes were characterized in the records as delusional. A regime of drug therapy was prescribed.
The PSI report, among other things, noted that Einfeldt had been diagnosed *778 with "Schizo-Affective Disorder and Bipolar Depression" at Broadlawns. She had episodes of paranoia in the past and had received treatment for mental health issues. Based on Einfeldt's self-report, and corroborated in the interview, the PSI report stated that Einfeldt was reporting "psychotic characteristics." The PSI report recommended an assessment by a licensed professional "to more thoroughly examine the validity and severity of these observed features."
The district court again declined to order a chapter 812 hearing. The district court stressed that up until the trial, the issue of her competency had not been presented by counsel. The district court stated that while there had been disruptive behavior, there was no behavior that indicated she did not understand the charge or was unable to assist counsel with her own defense.
The district court then moved on to sentencing, and Einfeldt was called to the stand by her attorney. In response to her attorney's questions, Einfeldt gave rambling, off-topic, and incoherent answers. For example, when her attorney asked her to confirm that they were asking the court to sentence her to probation, Einfeldt denied wanting to ask for probation and denied that she and her attorney were trying to seek probation. She announced that she did not care, and then she launched into a narrative in which she said that she could not think of three positive things about herself for the PSI report, that she was hurt by the PSI report author thinking she would reoffend, and that she would have lower recidivism because "[m]y prison number is 80655. You never forget that crap." She then explained that the first crime she committed was theft in second grade, that her mother made her stand in the cellar for a week as punishment, that she was made to feel ashamed in school, that she is "a fighter" and no one messes with her, and that she never wanted a jury trial but instead wanted a bench trial. She concluded by denying that she cares about herself and stating, "I live my life every day for death. I don't want to be here."
After this allocution, the district court sentenced Einfeldt to a term of up to five years' incarceration. Einfeldt appealed.
II. Standard of Review.
We review whether a trial court should have ordered a competency hearing de novo. State v. Mann , 512 N.W.2d 528, 531 (Iowa 1994) ; Jones v. State , 479 N.W.2d 265, 270 (Iowa 1991).
"Evidentiary rulings are generally reviewed for abuse of discretion." State v. Tipton , 897 N.W.2d 653, 690 (Iowa 2017) ; see also State v. Buenaventura , 660 N.W.2d 38, 50 (Iowa 2003). If a trial court exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable," an abuse of discretion has occurred. Buenaventura , 660 N.W.2d at 50 (quoting State v. Rodriquez , 636 N.W.2d 234, 239 (Iowa 2001) ); see also Tipton , 897 N.W.2d at 690.
III. Overview of Requirement of Evaluation of Competency to Stand Trial.
A. Due Process. Under the United States Constitution, the United States Supreme Court has declared that the conviction of an incompetent defendant violates due process. Pate v. Robinson , 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). In Dusky v. United States , a one-page opinion, the Supreme Court declared that the test for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and ... a rational as well as factual understanding of the proceedings *779 against him." 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curium).
The Supreme Court has also declared that in order to comport with due process, there must be a procedural mechanism to determine whether a competency evaluation should be conducted. Ford v. Wainwright , 477 U.S. 399, 417, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335 (1986) ; Pate , 383 U.S. at 387, 86 S.Ct. at 843. The Supreme Court has said that due process requires a threshold hearing to be held to determine if there is sufficient doubt regarding the defendant's mental capacity to show a need for further evaluation. Drope v. Missouri , 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975). Further, the Supreme Court has made it clear that a defendant cannot waive the due process right to competency. Pate , 383 U.S. at 384, 86 S.Ct. at 841.
The constitutional commands of due process have been captured in the ABA's Criminal Justice Standards on Mental Health. Criminal Justice Standards on Mental Health (Am. Bar Ass'n 2016), https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/mental_health_standards_2016.authcheckdam.pdf [hereinafter Mental Health Standards]. The ABA standards generally incorporate Dusky , noting that the test for determining a defendant's competency when represented by counsel should be "whether the defendant has sufficient present ability to consult with defendant's lawyer with a reasonable degree of rational understanding" and whether the defendant "has a rational as well as factual understanding of the proceedings." Id. standard 7-5.2, at 43. The standards emphasize that the question of competence may be raised "at any stage of the proceedings." Id. standard 7-4.4, at 32. Defense counsel may move for a competency evaluation even if the motion is over the defendant's objection. Id. standard 7-4.3(c), at 31. If a motion for a competency evaluation is made by a represented defendant after probable cause has been found that a criminal violation has occurred, the court should enter an order for an evaluation if there is "a good faith doubt" as to the competency of the defendant. Id. standard 7-4.4(a), at 32.
B. Statutory Provisions. Iowa, like many states, has adopted a statutory procedure to implement the federal due process requirements as enunciated by the Supreme Court. Iowa Code section 812.3(1) provides that "at any stage of a criminal proceeding" a competency hearing is required when the district court finds probable cause that there exist "specific facts showing that the defendant is suffering from a mental disorder which prevents the defendant from appreciating the charge, understanding the proceedings, or assisting effectively in the defense." The court may make a finding of probable cause either after application by the defendant or the defendant's attorney, or after holding a probable cause hearing on its own motion. Id. Probable cause exists for a competency hearing when a reasonable person would believe that there is a substantial question of the defendant's competency. State v. Kempf , 282 N.W.2d 704, 706 (Iowa 1979) ; see also Moore v. United States , 464 F.2d 663, 666 (9th Cir. 1972) (noting that due process requires that when evidence raises a reasonable doubt about the defendant's competency to stand trial, it is "substantial evidence" requiring that a competency hearing be held under the rule of Pate ). When the district court orders an evaluation of competency, Iowa Code section 812.4 establishes a timetable for the subsequent competency hearing and the structure of the hearing.
*780 We have emphasized that whether to hold a competency evaluation presents a legal question. State v. Edwards , 507 N.W.2d 393, 395 (Iowa 1993). As a result, "[t]he trial court's discretion does not play a role ...." Id. When a constitutional question is raised, our review of a district court decision regarding whether to order a competency evaluation is de novo. Id.
In connection with application of section 812.3, we have favorably cited Griffin v. Lockhart , 935 F.2d 926, 930 (8th Cir. 1991), for the proposition that a hearing should be held when a reasonable trial judge would experience doubt on whether the defendant was competent to stand trial. Mann , 512 N.W.2d at 531. Griffin also stands for the proposition that "an express doubt by the attorney for the accused is a legitimate factor to consider." 935 F.2d at 930.
IV. Application of Due Process and Statutory Requirements.
Einfeldt claims that her constitutional right to due process[2] as well as her statutory rights under Iowa Code chapter 812 were violated by the refusal of the district court to order a competency hearing in this case.
Upon review of the entire record, we conclude the district court was presented with sufficient reason to order a competency evaluation under Iowa Code section 812.3, which is a statutory expression of state and federal due process requirements. The professional statement of Einfeldt's attorney regarding the difficulty of representation plays an important role. See United States v. Sandoval , 365 F.Supp.2d 319, 321-22, 325-26 (E.D.N.Y. 2005) (relying heavily on the opinions of defense counsel regarding competence); Jones v. State , 362 So.2d 1334, 1336 (Fla. 1978) (per curiam) (noting role of representations of counsel in determining competency issues); Richard J. Bonnie, The Competence of Criminal Defendants: Beyond Dusky and Drope, 47 U. Miami L. Rev. 539, 563 (1993) [hereinafter Bonnie] ("[T]he attorney is best situated to know whether the defendant's impairments compromise the defense of the case."). Her professed statements about wanting to kill her lawyer and stab her lawyer in the neck with a pen, her statement that she did not know why the lawyer was seated beside her, and her stated belief that her lawyer would turn over her notes to the State gives one pause. Einfeldt's lack of memory about what occurred during the prior day at trial is also troublesome.
Before the district court, Einfeldt's lawyer made a credible initial showing that Einfeldt could not have the kind of relationship *781 with her lawyer to assist in the development of her legal defense due to her mental state. See Dusky , 362 U.S. at 402, 80 S.Ct. at 789. Competency evaluations include a "careful assessment of the accused's ability to interact with counsel." See John T. Philipsborn, Searching for Uniformity in Adjudications of the Accused's Competence to Assist and Consult in Capital Cases , 10 Psychol. Pub. Pol'y & L. 417, 422 (2004). Certainly competence to assist counsel includes a capacity to recognize and relate pertinent information to counsel concerning the facts of the case. Bonnie, 47 U. Miami L. Rev. at 561. The ABA standards stress the need for "present ability" to consult with counsel. Mental Health Standards, standards 7-4.2, -5.2, -8.7, at 30, 43, 62. The ABA standards also note that a finding of incompetence to proceed may arise from any mental disorder or condition "as long as it results in a defendant's inability to consult with defense counsel ...." Id. standard 7-4.1, at 30.
Further, the "rational understanding" required under Dusky means more than being "oriented to time and place" but includes accurate perception of reality and proper response to the world around the defendant, not disruptive behavior and a paranoid relationship with counsel. Lafferty v. Cook , 949 F.2d 1546, 1550 (10th Cir. 1991) (quoting Dusky , 362 U.S. at 402, 80 S.Ct. at 789 ). Here, we have evidence of a previous diagnosis of paranoid schizophrenia, along with contemporaneous testimony about bizarre thoughts and behavior, including claims of collusion between defendant's counsel and the prosecution. See United States v. Ghane , 490 F.3d 1036, 1040-41 (8th Cir. 2007) (finding defendant who suffered from intermittent periods of delusional paranoia and whose behavior indicated distrust of his own lawyers incompetent); United States v. Friedman , 366 F.3d 975, 980-81 (9th Cir. 2004) (finding defendant incompetent because paranoid schizophrenia directly prevented rational assistance in defense); United States v. Hemsi , 901 F.2d 293, 296 (2d Cir. 1990) (finding defendant incompetent when record revealed inability to cooperate rationally in own defense because of paranoia); Nagi v. People , 389 P.3d 875, 879 (Colo. 2017) (noting "wild accusations of collusion between his counsel and the prosecution" a factor indicating need for competency evaluation).
When the record shows that the defendant wants to stab her lawyer in the neck and kill him, believes her lawyer is turning written notes over to the prosecution, recently has heard buzzing noises, claims to have been told by the FBI she did nothing wrong, states she is worried about someone poisoning the water, and has advised the court that she has had a history of mental health issues including a diagnosis of paranoid schizophrenia, yet was noncompliant with prescribed drug therapy, a reasonable trial court should at least have some doubts as to the defendant's competency to effectively assist in the defense as required by Iowa Code section 812.3(1). See Maxwell v. Roe , 606 F.3d 561, 569-70 (9th Cir. 2010) (holding reasonable doubt of defendant's competence was created by defendant's history of mental illness, refusal to take prescribed antipsychotic medication, inability to control himself in the courtroom, and exhibition of paranoia impairing attorney-client relationship). Consistent with ABA Standard 7-4.1(d) related to inability to consult with defense counsel, the Supreme Court has stated that any one factor alone may sufficiently raise a reasonable doubt in the mind of a reasonable trial judge. Dusky , 362 U.S. at 402, 80 S.Ct. at 789 ; Mental Health Standards, standard 7-4.1(d), at 30.
There is, perhaps, the question of malingering. The Supreme Court addressed malingering *782 in the context of competency evaluations in Cooper v. Oklahoma , 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). In Cooper , the question was whether a state could impose a heightened "clear and convincing" standard of proof on a defendant seeking to show incompetence. Id. at 362, 116 S.Ct. at 1380. In rejecting a higher standard of proof, the Supreme Court looked at the consequences of error. Id. at 362-63, 116 S.Ct. at 1381. According to the Cooper Court, "For the defendant, the consequences of an erroneous determination of competence are dire. Because he lacks the ability to communicate effectively with counsel, he may be unable to exercise other 'rights deemed essential to a fair trial.' " Id. at 364, 116 S.Ct. at 1381 (quoting Riggins v. Nevada , 504 U.S. 127, 139, 112 S.Ct. 1810, 1817, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring) ). On the other hand, "[b]y comparison to the defendant's interest, the injury to the State of the opposite error-a conclusion that the defendant is incompetent when he is in fact malingering-is modest." Id. at 365, 116 S.Ct. at 1382. The teaching of Cooper regarding comparative interests of the state and the defendant is particularly compelling in the context of a preliminary proceeding to simply order a mental health evaluation.
And, it is true that Einfeldt expressed the view that trial should continue. So did the defendant in Kempf, who declared he desired to plead guilty and get started on prison time to "get it over with." 282 N.W.2d at 707. Such statements did not defeat the assertion of incompetence advanced by Kempf's counsel. Id. at 707, 710 ; see also Sandoval , 365 F.Supp.2d at 324, 328 (finding defendant incompetent despite defendant denying incompetence). They should not do so here.
It is important that our district court judges not put the proverbial cart before the horse in the competency setting. The district court was not called upon in this case to make a definitive determination of competency. See Moore , 464 F.2d at 666 ; Commonwealth v. Kostka , 370 Mass. 516, 350 N.E.2d 444, 449 (1976). The only question was whether the relatively low threshold had been met to require further evaluation and a subsequent hearing on the question of competency after a professional evaluation. Cf. Blakeney v. United States , 77 A.3d 328, 348 (D.C. 2013) (characterizing reasonable doubt threshold of local law on competency as not difficult to reach by design); Bonnie, 47 U. Miami L. Rev. at 563 (characterizing the threshold for referral for further inquiry as "very low in order to cleanse all cases of doubts about competence"). The trial court must take care to ensure that the preliminary hearing to determine whether there is a bona fide doubt as to the defendant's competency does not turn into a substitute for the determination of competency itself. State v. Bishop , 137 Ariz. 5, 667 P.2d 1331, 1334 (Ariz. Ct. App. 1983).
Here, it was not the district court but the PSI report which came to no specific conclusion regarding Einfeldt's mental health but, noting a diagnosis of schizo-affective disorder, "episodes of paranoia" in the past, and evidence of "multiple, and fairly significant, mood and/or anxiety disorder indicators," urged a thorough mental evaluation after sentencing. That was a good recommendation, but under the incompetency caselaw, this recommendation for a mental evaluation occurred at the wrong place and at the wrong time.
The district court relied in part upon its observations at trial. Such observations are, of course, relevant considerations. Yet, as the Supreme Court has emphasized,
[a]lthough a defendant's demeanor during trial may be such as to obviate "the *783 need for extensive reliance on psychiatric prediction concerning his capabilities," ... "this reasoning offers no justification for ignoring the uncontradicted testimony of ... (a) history of pronounced irrational behavior."
Drope , 420 U.S. at 179, 95 S.Ct. at 907 (first quoting Note, Incompetency to Stand Trial , 81 Harv. L. Rev. 454, 469 (1967) ; then quoting Pate , 383 U.S. at 385-86, 86 S.Ct. at 842 ). Here, in addition to the bizarre statements and conduct, there was evidence of a history of paranoid schizophrenia.[3]
The district court also relied on pretrial behavior of Einfeldt. But as the Supreme Court has noted, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope , 420 U.S. at 181, 95 S.Ct. at 908.
There is a question of remedy. At this late date, the possibility of making a meaningful determination of competency at the time of trial given the passage of time is simply not possible. See State v. Myers , 460 N.W.2d 458, 460 (Iowa 1990) (holding failure to hold a competency hearing probably not capable of cure by an ex post facto determination sometime after trial).[4] As a result, we reverse the judgment of the district court and remand the case for a new trial. In any subsequent trial, the district court should monitor the proceedings and ensure that the defendant's due process and statutory rights related to competency are properly protected throughout the proceedings.
V. Evidentiary Rulings.
Einfeldt argues that the district court erred by disallowing evidence of Vinson's prior assault convictions, threats against Chicoine, and involvement in the shots-fired incident at Einfeldt's apartment complex. Because these issues may reoccur on retrial, we address them.
A. Evidence of Violent Character of Victim. Under Iowa Rule of Evidence 5.404(a )(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." An exception to this rule is when a defendant seeks to offer "evidence of the victim's pertinent trait." Id. r. 5.404(a )(2)(A)(ii). While ordinarily evidence of a victim's prior violent or turbulent character is immaterial and not admissible *784 at trial, if the accused asserts he or she acted in self-defense, specific instances of the victim's conduct may be used to demonstrate his or her violent or turbulent character. State v. Webster , 865 N.W.2d 223, 243 (Iowa 2015) ; State v. Jacoby , 260 N.W.2d 828, 837 (Iowa 1977).
Yet, if such evidence's probative value is substantially outweighed by danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," a court may exclude the evidence. Iowa R. Evid. 5.403. We use a two-part test to determine whether evidence should be excluded under rule 5.403. Webster , 865 N.W.2d at 242 ; State v. Huston , 825 N.W.2d 531, 537 (Iowa 2013). "First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact." Webster , 865 N.W.2d at 242 (quoting Huston , 825 N.W.2d at 537 ). In weighing the probative value against the danger of unfair prejudice, we consider,
(1) the need for the proffered evidence "in view of the issues and other available evidence," (2) whether there is clear proof it occurred, (3) the "strength or weakness of the prior-acts evidence in supporting the issue sought to be prove[d]," and (4) the degree to which the evidence would improperly influence the jury.
State v. Martin , 704 N.W.2d 665, 672 (Iowa 2005) (quoting State v. Henderson , 696 N.W.2d 5, 11 (Iowa 2005) ). "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.' " State v. Putman , 848 N.W.2d 1, 10 (Iowa 2014) (quoting State v. Newell , 710 N.W.2d 6, 20-21 (Iowa 2006) ).
We believe that the district court acted within its discretion when it found that both the evidence of Vinson's prior felonies and Chicoine's testimony about threats were inadmissible under Iowa Rule of Evidence 5.403. With respect to the prior felonies, these assaults occurred over ten years ago, when Vinson was fifteen or sixteen and nineteen respectively. As our juvenile sentencing caselaw emphasizes, an adolescent's character is frequently not formed, and such adolescents often develop into adults with completely different characters. See State v. Sweet , 879 N.W.2d 811, 833 (Iowa 2016). Without any more recent evidence of convictions for assaults, evidence of assault convictions occurring during adolescence says very little about Vinson's adult character. The district court properly excluded this evidence as being substantially more prejudicial than probative.
Further, we find that the district court acted within its discretion when it excluded Chicoine's testimony about receiving threats from Vinson. As the district court noted, Vinson never assaulted Chicoine. Verbal threats are not very probative on the issue of a person's tendency toward physical confrontations and violence.
B. Evidence of Shots Fired. We affirm the district court's ruling excluding evidence of the shots-fired incident at Einfeldt's apartment complex. There was simply not enough evidence linking Vinson with the shooting or that Einfeldt or her daughters were the targets of the shooting. See Iowa R. Evid. 5.403 ; id. r. 5.404(a )(2)(A)(ii) ; Martin , 704 N.W.2d at 672. The district court was within its discretion in finding that this evidence was not relevant to Vinson's character.
VI. Conclusion.
For the above reasons, the judgment of the district court is reversed and the case *785 remanded to the district court for further proceedings.
REVERSED AND REMANDED.
All justices concur except Mansfield, Waterman, and Zager, JJ., who concur in part and dissent in part.

A few months after trial, Einfeldt filed a pro se motion for a new trial and in arrest of judgment. In the motion, she continued to express her belief that her lawyer was revealing confidential communication to the prosecution. She accused the prosecutor of engaging in prosecutorial misconduct by obtaining privileged communication between Einfeldt and her attorney and using this information to cause the State's witnesses to change their testimony. She additionally argued that she received ineffective assistance of counsel because her attorney disclosed confidential information to the prosecution. In a section apparently detailing her evidence showing that her counsel disclosed confidential communications to the prosecution, she described statements her attorney made such as telling her of his plans to go to a Subway after the outcome of the trial and order a Diet Coke, telling her that he finds dance recitals boring and would rather meet with clients, and stating to her that some evidence obtained from discovery was not admissible.

Einfeldt generically refers to "due process" and does not explicitly cite the Iowa or the United States Constitution. Under our caselaw, when a generic reference is made to a constitutional guaranty present in both the Iowa and United States Constitutions, the party does not offer a distinctive interpretation of the Iowa Constitution, and the party relies primarily on cases under the Federal Constitution, we apply the federal substantive standards, but reserve the right to apply those standards under the Iowa Constitution in a fashion different from prevailing federal authority. State v. Gaskins , 866 N.W.2d 1, 6 (Iowa 2015) ; King v. State , 797 N.W.2d 565, 571 (Iowa 2011). For independent state constitutional interpretations of the due process clause, see State v. Cox , 781 N.W.2d 757, 768 (2010) ("[T]he Iowa Constitution prohibits admission of prior bad acts evidence based solely on general propensity."); War Eagle Village Apartments v. Plummer , 775 N.W.2d 714, 721 (Iowa 2009) (holding notice by certified mail for forcible entry and detainer violates due process under Iowa Constitution); and Callender v. Skiles , 591 N.W.2d 182, 192 (Iowa 1999) ("We find a putative father of a child born into a marriage may have a right to standing to challenge paternity under the Due Process Clause of the Iowa Constitution.").

Of course, a past history of mental illness, without more, is insufficient to trigger a competency hearing under Iowa Code section 812.3 or due process. Jones , 479 N.W.2d at 270 ; Hickey v. Dist. Ct. , 174 N.W.2d 406, 410 (Iowa 1970). The question is one of present competency, not past malady. Further, even the presence of mental illness at trial, in and of itself, is not necessarily sufficient to trigger the requirement of a competency hearing under Iowa Code section 812.3 and due process. See State v. Myers , 460 N.W.2d 458, 460 (Iowa 1990) ; State v. Lucas , 323 N.W.2d 228, 233 (Iowa 1982). The present mental illness must be sufficient to give rise to a serious question as to whether the defendant meaningfully understands the charges and is capable of meaningfully assisting in the defense. Iowa Code § 812.3 ; Myers , 460 N.W.2d at 460.

On three occasions, the United States Supreme Court has considered and rejected the possibility of retrospective determination of competency to stand trial in criminal appeals. Drope v. Missouri , 420 U.S. 162, 183, 95 S. Ct. 896, 909 (1975) ; Pate v. Robinson , 383 U.S. 375, 387, 86 S. Ct. 836, 843 (1966) ; Dusky v. United States , 362 U.S. 402, 403, 80 S. Ct. 788, 789 (1960). Given the passage of time and the absence of any contemporaneous psychiatric examination directed to the issue of mental competency, we follow the approach of the United States Supreme Court in this case.